Next case is number 2007-5147, P.R. Contractors v. the U.S. Mr. DeCure, are you ready? Is it DeCure? DeCure. DeCure. Thank you. Good morning, Your Honor. It's Winston DeCure for P.R. Contractors. This is a case for an equitable adjustment. It's brought against the Corps of Engineers. It involves a levy repair or a levy improvement that's done every few years where you actually take earth in and around the New Orleans area, this is just below in St. Mary Parish, and you rebuild the earth in the levees. Mr. Patang was a contractor and was a qualified 8A contractor. The SBA received a call saying that they had to set aside for an 8A contractor. Mr. Patang began to negotiate with the Corps. His initial negotiation, he calculated the job to be about $4 million. The Corps began to negotiate with him, and quite frankly, they're not equal bargaining partners. The Corps says, no, it's too high. Here is what you can do it for. They negotiate. Mr. Patang says, I can't get trucks and people for the amounts that you've said. The Corps says, yes, we can. If you look at the record of the judge's opinion, there's quite a bit of dispute about whether or not they told him that they would make an adjustment if he could not. Your problem is that the factual determination went against you. Factual determination went against me. What's the basis for our setting that factual determination aside? There's quite a bit of evidence when you look at what happened. Quite frankly, when the judge goes and sets the factual determinations and negotiations against us, much of the case begins to fall apart because much of it is based upon that. A couple of things. You have to look at the totality, and that's what we argued to the judge. Judge, there was, first off, the minutes of the negotiations missed. Of course, it's a good fact, and the employee who kept the minutes wasn't there. They produced what's called a record of negotiation. The minutes would have had exactly what occurred. You can look at the record of negotiation, which is both in the appendix and in the record, and it indicates the dates upon which the negotiations took place, and it has some detail, but it's obvious that it was done from the minutes. Of course, the court can't find the minutes. Should we determine a negative influence because they couldn't find them? There was no determination of negative influence. There was no discussion of that. There was quite a bit of questioning of the witnesses about the minute-taking. The minute-taking was done by a fellow by the name of Mr. Standage, whom we requested had retired. They gave me an address, and, of course, I couldn't find him, and they didn't produce him. Mr. Standage was supposedly the minute-taker and was the preparer of the records of negotiation, which surmised those minutes. Mr. Partey participated in about three or four of these negotiations. On two occasions, he had the SBA representative with him, and that's when we began to really have a lot of dispute. During that time, they were talking about the trucking rates, and at this time, you have to understand Louisiana's economy goes up and down. There's lots of oil field stuff going on, and Mr. Partey said, I can't get the rates, the trucks for the rates that you're telling me. I can't get them. He said, yes, you can, and if you can't get them, we'll send you some people. That's from Mr. Coffey's testimony. We'll send you some people who will do it for those rates. That never came. What did come one day was a mysterious Mr. Burrus, and you see the judge refers to Mr. Burrus. While the negotiations were going on, someone appeared with Mr. Partey and said, I'm a sub. I can do this job. I've got it all calculated. They didn't deny. They did not confirm that they sent Mr. Burrus there. It's a very strange situation from the beginning. Mr. Coffey did not participate until the end, again, of the negotiations, but was aware. He said, I told Mr. Partey to watch these guys. They only told you they're going to give you a list of truckers who do the business. Mr. Burrus comes in, and Mr. Partey does not use Mr. Burrus, and there's a good reason. And you can see the familiarity, if you even look at the testimony of the judge quotes, where the court negotiator refers to him as Dickie Burrus. They're very familiar with all these people in this area. Mr. Burrus is going to do just about the whole job. Mr. Partey has an 8A contract, and the purpose of this 8A business is not only to give them business, but for them to be able to learn to do the business so that they can participate. Mr. Partey was not really interested in using Mr. Burrus, and Mr. Burrus actually went away. After much negotiation, Mr. Partey accepted their final proposal that they came up to, which was about $2 million. But where is the legal error by the lower court? Well, the totality of the circumstances. When we move from there, and if you look at the final numbers, the final numbers were actually almost right at what Mr. Partey's original proposal to them were. Also, you look at the totality of the circumstances where the court was urging him to do a couple of things. They wanted him to use Burrus to do the subcontracting, or to do almost all the job. It was a local guy. When we get to, if we continue to go, there's an inspector and a surveyor. And again, remember where we are. There's lots of questions about why Mr. Partey hired a Mr. Casey. Mr. Casey was hired, as Mr. Partey said, because the inspector, who was the government's inspector, lived next door to the surveyor. He said, this is the surveyor I want you to use. Mr. Elgazabo testified, an inspector gives you lots of problems. This inspector gave him lots of problems and was fired. Eventually, the surveyor was fired. That surveyor, when he was fired, took what's called the record books of the settlement plates. These are plates they put out to shoot elevations to determine how much the earth has moved and how much settlement there was. He takes those things with him. Mr. Partey now has Well, you're trying to retry the facts before us. You just got a question, what's the legal error? We can't retry the facts for you. The legal error, John, is one, with regard to many of the calculations, we think that they could be made. One, there's an overrun and underrun, where if it's 85% low or 115% high, you get the overrun or underrun calculation. If you look at the cause decision by the contracting officer, the contracting officer found that, looking at the same evidence, in fact, two have merit. It's in her decision, it's in the appendix, and in the record. The judge at the claims court didn't find it to have merit, looking at the very same evidence. If you look at the shrinkage, there was a determination about the shrinkage, and that's when you move the dirt, you dig it up, it swells, you put it in the truck, you put it down, it humps, then it sinks. So they measure shrinkage. El Gazzabo, the cause project head, said, I measured it, they didn't take into consideration the shrinkage. Mr. Pate, the engineer, says, I measured it, they didn't take into consideration the shrinkage. The cause estimator says, yes, we did, and here's what I did to take into account. They allowed you the shrinkage, didn't they? They did not. For all of the shrinkage plates that you brought, that you demonstrated you had shrinkage on. Those were the settlement plates. There's a couple of different things. The settlement plates, when you put the plates down, the ground tends to bend, as we understood it. Not the stuff you're putting on it, but the ground goes down. When the ground goes down, the elevation changes. And you use the settlement plates to shoot the elevations, as opposed to the shrinkage of the material. So we're talking two different calculations. The settlement plates, the reason the settlement plates were missing were mainly because the engineer, the surveyor, who had the settlement plate locations, took the settlement plate books when the inspector was fired and he left, the government employee. Mr. Pate was unable to get those settlement locations back. Both Mr. El Gazzabo, the engineer for the Corps, and Mr. Heath, Mr. Pate's engineer, were easily able to calculate the settlement based upon the location of the settlement plates that they found. They simply extrapolated to the others. Both indicated that it's not unusual to lose those settlement plates. In fact, Mr. Heath said, usually those are the things that you resolve in the field. There's no question that we have just... Again, we have to look at the totality of the circumstances that's going on here. The hearing officer is a lady named Diane Picou. And if you look at the judge's decision, Ms. Picou indicated that she had only gone to high school, she had absolutely no idea about construction and engineering. But once again, where is the reversible legal error? We can only look at the reversible legal issues Where is it? We think that the findings of fact are totally wrong. Well, we can't change those, can we? As I reviewed the standard, the standard was that if the findings of fact were wrong, the court couldn't review them. Clearly wrong. Clearly wrong. And we think that they are from the circumstances that are in this case. It was a horrible, horrible case. And the one thing that I think we have to put before the court was this was a legal job that was completed, that was accepted, that was done appropriately. The government received a lot of extra time, a lot of extra material, a lot of extra work, and they got a good job. You're in your rebuttal time. You want to try to save your rebuttal time? I'll save some. Thank you very much. Ms. Schneider. Thank you, Your Honor. Sharon Schneider on behalf of the government. May it please the court. Plaintiff has not met its heavy burden of proving that the trial court's findings of fact were clearly erroneous. Plaintiff merely makes generalized challenges to the trial court's findings of fact, failing to point to anything specific. And plaintiff points to no support in the record other than general citations to lengthy portions of the transcript as well as generalized citations to documents. Plaintiff fails to show how any of that evidence may support a contrary finding by this court. Contrary to plaintiff's generalized assertions, the trial court carefully weighed the testimony and the documentary evidence here and found that plaintiff had not met its burden of proof, either because the testimony of the government's witnesses was more credible or because the documents used by plaintiffs did not support its assertions. There was ample evidence in the record to support the findings of fact by the trial, and as Your Honors have pointed out, there is no legal challenge by the plaintiff here. In fact, the plaintiff only makes conclusory assertions about findings of fact as it did for the trial court below and as it's done here before this court on appeal. The decision of the trial court should be affirmed based on the totality of the circumstances. Turning just briefly to the claims that the plaintiff has raised, Your Honor, the trial court found as to the first claim of relief, and that claim was that the government promised the plaintiff here that it would provide an equitable adjustment for labor and trucking costs. The trial court found that there was no credible evidence that the court had forced plaintiff to lower its bid for labor and trucking costs, found that there was no credible evidence that the court had promised that it would make any equitable adjustment if plaintiff's labor or trucking costs were higher than the bid at the conclusion of the contract. The trial court further found that there was no evidence to establish that plaintiff, in fact, as he said, set its labor costs at Davis-Bacon rates. And the court found that the testimony of Mr. Bovona, the cost engineer, the cost estimator on the contract, and Mr. William Reeves, the construction manager, she found that their testimony was credible. Appellant here points generally to the testimony of Mr. Patton, but the trial court rightly found that his testimony was generalized and unsupported, and in a major part self-serving. The plaintiff has provided no evidence in this court that would show otherwise. Turning to the second claim on appeal, the plaintiff claims that the court erred in finding that the government estimate did factor shrinkage into the estimate. The trial court found that the government estimate on its face considered shrinkage of material. The court found that the evidence provided with the testimony of Mr. Bovona, again the cost engineer who estimated the contract, was credible as compared to the testimony of Mr. Al-Ghazal, whose testimony was generalized about the shrinkage. In short, the trial court found that there was no credible evidence that the government did not consider shrinkage in its estimate. The plaintiff has provided no evidence here to demonstrate otherwise. Turning very briefly to the third claim, the plaintiff claims that it was entitled to recover for the underwrong under the variation in estimated quantity or the PEQ provision. The plaintiff points to Ms. Picoult's contracting, the contracting officer's decision, and he says, well, the contracting officer said that the plaintiff deserved to recover. That's not exactly what the contracting officer found. The contracting officer found that there was an underwrong in quantity, but that the plaintiff had to bring in documentation to prove that there was a basis for recovery. The trial court found that the plaintiff must show two things. First, that its costs increased and that that increase was due to a direct cause. It was directly caused by the underwrong. The trial court found that the plaintiff had failed to do that either through the testimony of Mr. Heath or Mr. Alcazaba. Turning finally to the fifth claim, I'm sorry, the fourth claim on relief, that the plaintiff was entitled to use an alternative method for determining settlement at the site at the conclusion of the contract. The trial court found that the plaintiff did not comply with the specific requirements in the contract for measuring the amount of additional fill placed at the site and therefore could not recover. The plaintiff has provided no evidence in this regard to show otherwise, and the government would move that the decision of the United States Court of Federal Claims should be approved. Thank you. Thank you, Ms. Schneider. Just briefly here, I have one and a half minutes. With regard to equitable adjustment, as I indicated earlier, the government got much more than what it paid for in this case. But what we need to do, what the court needs to do, is look at the Exhibits 8 and 9 prepared by Mr. Alcazaba when he was the Corps' project engineer. That claim, at that time, when he had no bias in either direction, his bias would have been for the Corps, he found that the Corps owed Mr. Pate over $700,000 and suggested that they settle with him. He resigned and eventually left or retired and testified for Mr. Pate. That in itself shows that when we went to trial, Mr. Pate was overwhelmed because all of the Corps' people who had prepared this project, who had been friendly with his subs, all were there to testify against him. They had lots of reason to be biased. If the court simply read Mr. Pate's testimony, read simply Mr. Alcazaba's preparation of the documents which he was directed to do by his boss... But you could have established the bias below. Was bias established? We attempted to establish the bias. The judge gave us no indication it's accepted. She resolved almost every issue of credibility in favor of a gun. What was the bias? The bias? Yeah, what was the bias? The bias was separate. The bias was, one, the Corps' people had some probably not very acceptable relationships with some of the subs. Their purpose was to have Mr. Buras actually do this job. They sent him to Mr. Pate. Mr. Pate rejected that. Mr. Buras was a local there. Then there was the engineer that the Corps' inspector, by the survey, the Corps' inspector required him to bring on. There was lots of things going on here. When the thing came to resolution before the contracting officer, the very same people who testified, the very same people who prepared the estimate were the people who wrote the decision for Ms. Pico. And she admits that. The judge indicates in her opinion. The contracting officer said she didn't know anything. She sent it to the construction division to write. She read it and approved it. So there were lots of things that were going on here on this little job. When you look at the totality of what's going on, as Mr. Heath, the cost engineer, says, contractors don't go into jobs to lose money. When they know that there's going to be another one, they won't take that job unless they know there's going to be an adjustment. It just doesn't make sense as you look through this. And the totality of the circumstances bears that out. And this was a good job. Mr. Pate actually finished it well. That's saying a lot for ladies and gents. Thank you. The case is submitted.